Can you both hear us? Can I get a thumbs up if you can hear us? There's one thumb, two thumbs. Okay, great. We're ready to hear your argument, counsel. Thank you. My apologies for being green today, but that's just what my computers are all doing. You're otherwise healthy. Otherwise healthy, yes. Yes, we are green. May it please the court. My name is Eitan Yonaj, and I am representing Jack Boggs in this appeal. Mr. Boggs has been unable to work since February of 2016, due primarily to the functional effects of his severe lumbar spine, degenerative disc disease, and degenerative joint disease with status post-compression fractures. The biggest error by the ALJ in this case involves his treatment of the medical opinion of an examining physician, Dr. Davenport. Dr. Davenport performed a detailed examination in which he found and described numerous significant objective findings of impairment, and some of the most significant findings he described included reduced strength in muscle systems throughout his body. So many ideas is not something you ordinarily will... I don't remember seeing this in any recent case. He had reduced strength in his flexion and extension of his shoulders, reduced strength in his elbows, his wrists in both flexion and extension, his hips, his knees, his ankles. He had very reduced range of motion. And so basically then... Counsel, could I interrupt here? Here's the nub of it for me in this case. There's some word intentionally of a negative credibility finding. There's the Waddell signs. And when I think about that sort of in the background, and we move to Dr. Davenport, I'm looking in Dr. Davenport's records for something that tells me... for an indication that's not dependent upon the degree of exertion, you know, the extent to which the patient is trying to comply with his request during the examination. Could you speak to that dilemma here? Yes. So first of all, a trained orthopedist like Dr. Davenport can tell whether or not a person is exerting strength or faking. They've got tests for that. He never reported any kind of problem or indication that there was anything other than a genuine effort throughout all the muscle testing. The same is true in range of motion testing. He described many range of motion limitations, and it's the same thing. He's a trained physician, an orthopedist who knew how to tell whether this was genuine. But turning back to your starting point there, which is the Waddell signs. Waddell signs do not indicate malingering. They can indicate malingering. And so, forgive me for interrupting, but you know, our time is so short. They can, they don't necessarily. I appreciate that. So could you speak to that coupled with, you know, the other thing that jumps out at me, and I'm not sure what to do with this, is that he's received conservative treatment and they seem to be tapering him from his narcotics, or at least concern. Some of the care providers were concerned about narcotics. Does that factor into the, do I take that into account when I look at this? No. Okay, why not? All patients are being weaned off of narcotics because of concerns of the oxycodone, the overdoses possibility. And so that is just basic widespread medical practice. In fact, it's recommended medical practice for pretty much everyone other than cancer patients. I think this is still an exception. So the fact that they were weaning him off of those meds is just an indication that, like everyone else, they were weaning him off those meds. That was the advice of the pain management doctor. He had been on narcotics for years, had he not? I mean, one of the things that he's taking so that he has to take more and more of them in order to get the same palliative effect. That is correct. Now, what sheds some light on his... Go ahead. The person has a question. Thank you. Okay. Two things. One is, didn't he at his hearing testify that he had been referred for a spinal injection, but that his insurance didn't approve it? Well, yes, but not only that, he was in the appeals council evidence. He actually made it to the orthopedic, Olympia Orthopedic, where he saw, there's a physician assistant, but that's who you will sometimes see when you go to the night actually doing surgery, who actually was independently documented the same types of problems that Dr. Davenport had documented. Now, granted, this evidence wasn't before the ALJ, but it was more confirmation that all of these problems he was having were real. Scott, could I follow up on this, please? Please. I appreciate the need to be concerned about ratcheting back the narcotics, but if he's in pain, I don't see any indication I could do anything else for him. That's what I'm concerned about. There wasn't physical therapy or yoga or... So what were they going to leave him with? I just see the one note that Judge Berzon mentioned about the injection. Was there some other... Did I miss something else, that they were going to do something else for him? There isn't a lot you can do when somebody has compression fractures. And so, I'm not an orthopedist. He went to Olympia Orthopedics, and all they could recommend at that point was an injection, which they hoped would help. And so, the fact that somebody does not have a condition that can be... That's amenable to surgery, for example, is not by itself an indication on what level of pain somebody is experiencing. But isn't the compression based upon the bones pushing against the nerves? Isn't that what a compression fracture is? Well, it's the effect. It's why a compression fracture hurts, certainly. And you're saying the medical testimony is that surgery can't alleviate that. Well, I'm not saying that it can't. I'm just saying that he's went to Olympia Orthopedic, and they had not yet recommended surgery for it. But that gets back to Judge Christen's question with regard to conservative medical treatment, because nobody recommended surgery here. Once again, people have conditions, medical conditions, that can cause excruciating pain, limiting pain. In this case, it caused pain that prevented him from being able to walk or stand or use his arms or hands. And you can have that level of pain without there being any kind of... I mean, the opioids weren't making him more functional. They were just making him hurt less. And the same was the goal with the injection. It would hopefully make him hurt less. But none of these things were curative. And you can have painful conditions that cannot be cured by an orthopedist, or it could be that they just hadn't reached the point yet of recommending some type of treatment. One other sort of more conceptual question. My understanding, the doctor that the ALJ relied on the most was Dr. Irwin. Was that his name? He did his study. He looked at records in 2016. And the records go through 2019. And the records seem to show that the situation was getting worse. I mean, it says so, what his pain levels are. So what happens? I mean, suppose what should have happened is that it appeared that maybe he wasn't disabled in 2016, or that Dr. Irwin was accurate in 2016. But sometime over the period that was covered, the situation became worse and he was disabled, say when Dr. Davenport examined him. How does that spin out in terms of the outcome of the case? Or what should the ALJ have done with that? Well, one of the complications with the ALJ's treatment of the evidence is that he rejected Dr. Davenport's opinion because he stated that there were no objective findings. I know that. I'm not asking you that. I'm asking you a particular question, to which I'd like the legal answer. Well, what an ALJ can do in a situation like that is say, well, this earlier evidence shows that he perhaps could still do sedentary work or light work, some level of work that's consistent with it. And then later could say, well, then with this latest evidence, which shows that he can't stand for more than an hour or walk for more than an hour or sit for more than an hour, that changes the situation. And therefore he gets disability insurance starting at some later date or what? Yes, that's what an ALJ can do if he's fairly evaluating the evidence. And something I just have to respond to is just a reminder that Dr. Irwin never, but I think you're aware of this, he was a non-examining physician. He never met or examined Bob. He just looked at the medical records and gave an opinion based on his review. That's right. The medical records that were present in 2016. And I would like to reserve some time for a follow-up. Just about out of time. Let's hear from opposing counsel, please. May it please the court and counsel, Lars Nelson on behalf of the Commissioner of Social Security. This court should affirm the decision of the ALJ because it is supported by substantial evidence. In this case, there were Waddell signs, which are a non-organic origin of the pain. It can be evidence of malingering. Mr. Boggs appeared at the hearing. Did the doctor find that he was malingering? He did not diagnose malingering, but he did recommend that the claimant taper his medications. He recommended that the claimant stop smoking, which can contribute to the bone degeneration in his spine and can dull the effects of pain. That's not malingering, though. I mean, that's a medical recommendation. It doesn't say that he was malingering when he felt his pain. I didn't see a malingering finding anywhere. Is Judge Berzon right? I missed it if there is one. Is there one? There is no diagnosis of malingering. No. This is affirmative evidence that the ALJ relied on. Okay. So then, relatedly, if we can go to the drug... There's certainly indications in the record that they were tapering medication, but I didn't see pain-seeking behavior. That's another kind of buzz phrase that we look for. I didn't see that anywhere either. Did I miss it? Well, I mean, drug-seeking behavior. I mean, they did submit him to drug testing. That was cited by the ALJ. That's the first on 38 when the ALJ is mentioning his... whether he's taking medications or not. So there was drug testing that he had to undergo, but there's no evidence that he was pursuing drug-seeking behavior. I think drug-seeking behavior usually involves going to multiple practitioners and obtaining narcotics, but it looked to me like he kept getting his prescriptions refilled through the clinic in... Was it Raymond, Washington, that he was going to? Yeah, the Valley View Health Center. But Dr. Irving, the pain specialist at Swedish Medical Center, recommended that he taper his medications, and those doctors, in fact, did taper his throughout the period. That was in 2016. So I'm going back to the question I asked before. That was in 2016. Apparently, when he tapered his medication, and there is some record that he did, I don't know if he succeeded, but that he went to a whole series of smoke cessation workshops and so on. I don't know where that ended up, but he did it. Nonetheless, he ended up back on the medication because apparently it didn't work, and he tried to get an injection, but apparently wasn't able to. So what about this longitudinal problem that I mentioned before? That Dr. Irving and Dr. Irwin were looking at the situation in 2016. We have records that go through 2019. Why are we not crediting the later conclusions by Dr. Davenport and by the nurse practitioner and Dr. Dalton? I'm confusing them now, but at any event, a series of different practitioners later, one of whom did do an orthopedic examination, which was objective, and came to different conclusions. How did the ALJ kind of take the earlier material and disregard the later material? Can he do that, or is there a period? Does he at least have to say, well, maybe he wasn't disabled in 2016, but at some later point he was? On certain records, an ALJ can certainly make that distinction and have closed periods of disability or have a later start based upon the evidence. Here, the ALJ had two logical bridges that connected the two periods of time. The one would be the consistent medication. We have medication throughout the relevant period, and that is the only treatment we have. That links it from Dr. Irving's time. But the attempt to taper it off apparently didn't work. He couldn't operate without it. Well, the doctors, if you look at 1964 in the record, which is the Appeals Council record, he was, in fact, still tapering at one tablet every other day. So that was post-dating the relevant period. So, I mean, they're still attempting to taper it. And then the other factor we look at is nurse practitioner Fidel's treatment records, which are the 7F records that the ALJ has the long string sites to. And those show that we're not seeing a change or deterioration. And the fact that his epidural injection, that's page very one of the record, did not work is not surprising because what Dell signs say indicate that the pain was not of organic nature, that the epidurals, there was nothing for them to cure. And that's consistent with the mild to moderate degeneration shown on the spine without nerve root impingement or stenosis. Nothing is squeezing his spinal column and causing him pain. And it's also, the ALJ also had to view the contrast between his subjective complaints and the consistent treatments because he showed up to the hearing and he testified, I experienced nine out of 10 pain daily. That's at 101 in the record. He says meds do not help at all. That's 101 in the record. But when he saw Dr. Irving, he said that his pain was two out of 10 when he was on meds. And that's at 489 in the record. And we can also look at nurse practitioner Fidel's records all throughout 2018, 644, 651, 657, 672. It goes on where she managed, well-managed with his pain medications. What are the dates on those entries, counsel? What are the dates of those entries? Those are all from 2018, nurse practitioner Fidel's. There are 2015 records from a doctor of osteopathy at 636, 447, 451, 455. So the ALJ had a link between 2015 evidence and as well as later evidence to form this bridge between these periods of time. And obviously Dr. Irving did not perform an examination here, but the ALJ found it to be consistent with the record and from the records that Dr. Irving would have been familiar with. Same thing with Dr. Davenport. The ALJ identified findings that Dr. Davenport reached, for example, on pulmonary problems and arthritis that were not supported by objective testing that Dr. Davenport did, and then also made the additional finding that is inconsistent with this record as a whole. When we look at this record, it's most... I'm looking at the 2018 records which say, the ones I'm looking at say the problem is worsening, 10 out of 10, so on. Can you tell me what ones you're relying on? Yeah, I'm looking at the... Give me a page number. Yeah, if we looked at for, I think just for example, we could say like 672, and those are all records that I'm relying that the ALJ cited to Dr. Nurse Practitioner Fidel's, her examination findings. If we look at 672, we scroll down to the bottom and it says, low back pain is the diagnosis. Patient's pain is well managed on current medication therapy. Refilled today, continue taking medications as prescribed. And she says this numerous times. Pain is described as 7 out of 10 at the beginning of the report. Yes, that is his subjective report, and then Nurse Fidel is reaching an alternative conclusion. He alleges extreme pain here. There's no dispute about that. That was actually at the end of 2017, the ones I was looking at were later. I mean, we can go to a later record if your honor would like. Would you please? Yeah, we can go to, well, I mean the final record in the most recent treatment note is at 578, which is January 3rd of 2019. And that starts by saying his symptoms are relieved by medication. And in fact, almost all of the records from Valley View Medical Center begin by noting that very fact. I think if we look at 644 of the record, that's from May of 2018. And again, this is Nurse Practitioner Fidel. Pain is well managed. So on this record, I believe the ALJ had a logical bridge that covered the entire relevant period. As Judge Christin held in McAvinney, Waddell signs can be a sign of malingering. And accordingly, the commissioner would ask this court to affirm because substantial evidence supports the ALJ's decision. Well, on that last point, maybe they could be, but the ALJ simply asserted that malingering was found, which is not true. Well, under this court's case law, the ALJ needs to have affirmative evidence of malingering. So the ALJ has to reach some sort of conclusion based on it. And the ALJ cited the Waddells and linked that with the finding of malingering. And I would submit that that would be sufficient, especially in light of McAvinney. So you're saying he can reach that conclusion without having a doctor diagnose malingering? Yes. And that's simply just to trigger the standard of review. The Waddell signs would have been sufficient enough of a non-organic origin for the ALJ to discount the claimant's subjective complaints. We've taken you over time. Thank you for your argument, counsel. We'll hear from opposing counsel. Madam Clerk, could you put two minutes on the clock? Thank you. I think that Judge Burson pointed out one of the key issues here, which is there is no diagnosis of malingering. I've seen diagnoses of malingering. A doctor does the testing, finds maybe what else, finds maybe something else. Whatever the reason is, they diagnose the person with malingering. They say this person is malingering. So you're saying the ALJ is not qualified to make that determination in reliance on Waddell signs being noted in the record? No, he's not. In light of the fact that no doctor made such a finding, I think the ALJ is reaching here beyond his expertise. He's not. If the degenerative disease, can the ALJ make that diagnosis? No. There was evidence in the record, at least earlier, closer to 2016, that he was regularly reporting pain scale numbers which were lower on the scale. That would tend, would they not, to support the possibility of malingering if at the same time the Waddell signs are noted? The thing is, the numbers don't mean that much, because if he's reporting lower numbers at that point, he was taking more medication. He should have been having lower numbers at that point. This was before they started tapering him? Yes. Okay. One last thing. What the ALJ says is that the doctor reported significant malingering activity, parentheses Waddell signs. That's not accurate, right? In other words, it can be malingering behavior and it cannot be malingering behavior, and the doctor didn't report it as malingering behavior. So, it's a simply inaccurate statement as to what the doctor reported. Is that right? Hello? I think he's frozen. Looks like Mr. Janich might be frozen. I'll give him a call. Thank you. Okay. We'll be off record for just a minute, but we're waiting for that. I'm sure they'll rope him back in here in a minute. Mr. Janich, can you hear us all right? There he is. You're not even green. Can you hear me? It's a miracle. Yes. I can't see you, but my computer died, and so I just turned it back on. The answer to Judge Brisson's question, which I heard was, yes. I don't remember the question anymore. Hold on, hold on, hold on. Judge Brisson, we're just down to the last few bits here. All I was asking was, the reference I see to the malingering behavior in the ALJ opinion, maybe there's more than one, but the one on page ER24 is where the ALJ says that the doctor noted significant malingering behavior, parentheses, Waddell's. It was a statement, not of an inference from the Waddell, but it was a statement about what the doctor noted, which is inaccurate. The doctor didn't say there was significant malingering behavior. Is that right? Precisely. He noted the Waddell signs, but one of the things that the government pointed out, he noted four out of four pain behaviors, which means grimacing, rubbing, verbalizing, and sighing. That just means he was showing a lot of pain behavior. It doesn't mean that that's not real. Yes, but I agree. He was the expert. If he thought there was actual malingering, he would have put it in his report. He didn't. Counsel, I think you're out of time. Thank you. All right. Thank you both for your arguments. We'll take this case under advisement.
judges: BERZON, TALLMAN, CHRISTEN